In the Matter of TENNESSEE CENTRAL RAILWAY COMPANY, Debtor.

UNITED STATES of America, Plaintiff-Appellant,

v.

A. Battle RODES, Trustee of Tennessee Central Railway Company, Defendant-Appellee.

No. 71–1228.

United States Court of Appeals, Sixth Circuit.

Feb. 2, 1972.

Rehearing En Banc Denied April 4, 1972.

Certiorari Denied Oct. 10, 1972.
See 93 S.Ct. 119, 126.

74

William E. Nelson, Dept. of Justice, Washington, D. C., for appellant; L. Patrick Gray, III, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., Charles H. Anderson, U. S. Atty., Ames Davis, Asst. U. S. Atty., Nashville, Tenn., on brief.

David M. Keeble, Nashville, Tenn., for appellees; Roy Sherman, Philip M. Lanier, Louisville, Ky., on brief for the L. & N. R.R. Co.; William F. Bunn, Gen. Atty., Chicago, Ill., on brief for the Illinois Central Railroad; Duncan B. Phillips, Washington, D. C., on brief for Southern Railway System.

Daniel E. Seay, Lebanon, Tenn., Back Tax Atty., Wilson County.

O. Lawrence Dortch, Nashville, Tenn., for Humble Oil and Refining Co.; William L. Brooks, Nashville, Tenn., on brief; Waller, Lansden, Dortch & Davis, Nashville, Tenn., of counsel.

Wilson Sims, Nashville, Tenn., for Koppers Co.; Bass, Berry & Sims, Nashville, Tenn., of counsel.

Ogden Stokes, Asst. Metropolitan Atty., Dept. of Law, Nashville, Tenn., on brief for The Metropolitan Government of Nashville and Davidson County, Tenn.

Carmack Cochran, Nashville, Tenn., on brief for A. Battle Rodes, Trustee; Martin & Cochran, Nashville, Tenn., of counsel.

Lowell H. Jacobson, Jacobson, Brandvik & Padgitt, Chicago, Ill., on petition for rehearing in banc on behalf of Chicago Freight Car Leasing Co.

David S. Field, Asst. Metropolitan Atty., Nashville, Tenn., on petition for rehearing on behalf of The Metropolitan Government of Nashville and Davidson County, Tenn.

Before EDWARDS, PECK and BROOKS,* Circuit Judges.

EDWARDS, Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the Middle District of Tennessee, 316 F.Supp. 1103. This issue is whether the federal government has priority in a section 77 railroad reorganization proceeding (11 U.S.C. § 205 (1970)) for debts due it over the equitable priority accorded to "six months claimants."

The government claim is based upon a federal statute, 31 U.S.C. § 191 (1970) (R.S. § 3466), adopted in 1797 giving it priority as to debts due it in any bankruptcy proceeding. The contesting claimants assert equitable priority because they furnished essentials to the bankrupt for the last six months of its operation before its insolvency.

In a well reasoned opinion the District Judge held that the Congressional purposes set forth in section 77 of the Railroad Reorganization Acts were better served by giving precedence to the equitable priority of the six months claimants. However, in United States v. Key,

397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1969) (a case not argued to the District Court), the United States Supreme Court, acting unanimously, emphatically affirmed the federal priority accorded by § 3466 in a Chapter X case also concerning a corporate reorganization, but one not involving a railroad. Although the Supreme Court plainly did not have our exact issue before it, there is a close analogy between the *Key* case and this one. In addition, the *Key* opinion discussed section 77 and commented, "Nothing in § 77 casts any doubt on the continued priority of the United States under § 3466." United States v. Key, *supra* at 330, 90 S.Ct. at 1054, 25 L.Ed.2d 340.

The dictum just quoted, plus the strong analogy between the *Key* case and this case and the language of § 3466 itself all serve to convince us that we must reverse.

The Tennessee Central Railway Company was placed in reorganization under section 77 of the National Bankruptcy Act on December 14, 1967, after several years of operational losses. The Tennessee Central Railway Company has now ceased operations after selling all but a very small portion of its lines to three connecting railroads in 1968.

Appellees' claims in this case are for interline charges for services provided by connecting railroads, taxes due to local governments, and some diesel oil, wood and similar types of supplies for TCR provided by various private corporations—all related to the six month period before the reorganization proceedings. They totaled approximately $3 million.

The United States Government claims arise from two Reconstruction Finance Corporation loans (never repaid) upon which the United States was owed approximately $5.5 million as of the time of reorganization. The principal claim of the United States Government was secured by liens upon the entire TCR bond issue which came due April 1, 1967. If

---

* Honorable Henry L. Brooks died on December 30, 1971.

given full effect, the United States claims would serve to wipe out any balance left in the hands of the Trustee after sale of TCR's assets to three of the railroads which previously connected with it.

The District Court, before whom the Trustee had filed a petition to determine classes of creditors and the priorities to be assigned to each, held that § 3466 was inapplicable to a section 77 proceeding and that the interline carriers, suppliers and local taxing authorities were entitled to priority over the claims of the United States.

The rationale which led to the District Court's result and that urged upon us by appellees may be summarized thus:

1) There is a great public interest involved in the continuing operation of railroads—more so than in continued operation of other private corporations.

2) Congress recognized this interest in the enactment of section 77.

3) In addition, in a paragraph of section 77 (77(b)), Congress referred to and sought to preserve aspects of the equitable receivership which created the six months creditor priority rule.

We approach decision of this case with the fact in mind that bankruptcy proceedings are among the topics specifically committed to Congressional power by the Constitution of the United States. Article 1 § 8 of the Constitution says in part:

"The Congress shall have power

. . .

\* \* \* \* \* \*

"To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States;
. . ."

As we have noted, the fundamental statute which we must construe in this case is R.S. § 3466 (31 U.S.C. § 191 (1970)) adopted in 1797. It provides:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the execu-tor or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." R.S. § 3466.

■ There can be no doubt that TCR, for purposes of this statute, is "a person indebted to the United States [who] is insolvent." Equally plainly the $5.5 million which TCR owed the United States is a "debt" within the meaning of this statute.

■ By its plain language § 3466 applies to this case. And the language "the debts due to the United States shall be first satisfied" is unambiguous and mandatory.

Appellees, however, rely, as did the District Court, upon section 77, passed in 1933, and more particularly on section 77(b):

"For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors." 11 U.S.C. § 205(b) (1970).

The difficulty with appellees' argument is that section 77(b) contains no language arguably referring to or superseding the effect of § 3466. The situation here is much like that dealt with in United States v. Emory, 314 U.S. 423, 62 S.Ct. 317, 86 L.Ed. 315 (1941), where the Supreme Court set down the rules for interpreting § 3466:

"The applicability of § 3466 to this case is clear. The section applies in terms to cases '[1] in which a debtor,

not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or [2] in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, . . . [or] [3] in which an act of bankruptcy is committed.' This case falls within the third category. It is agreed that the St. James Distillery was insolvent 'on or before August 1936' and that in response to a creditor's petition a receiver was appointed to liquidate the corporate assets. The appointment of a receiver under such circumstances is among the most common examples of an 'act of bankruptcy.' *Cf.* § 3(a) (4) of the Bankruptcy Act, U.S.C., Title 11, § 21(a) (4).

"Just such proceedings as this, therefore, are governed by the plain command of § 3466 that 'debts due to the United States shall be first satisfied.' The purpose of this section is 'to secure adequate public revenues to sustain the public burden' (United States v. State Bank of North Carolina, 6 Pet. 29, 35 [8 L.Ed. 308]), and it is to be construed liberally in order to effectuate that purpose (Bramwell v. United States Fidelity & Guaranty Co., 269 U.S. 483, 487 [46 S.Ct. 176, 70 L.Ed. 368]). In view of this language, purpose, and rule of construction, the priority asserted here by the United States appears to be securely established." United States v. Emory, *supra* at 426, 62 S.Ct. at 319.

*See also* Small Business Administration v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960). Both of these cases hold that only "the plainest inconsistency" would warrant an implied exception to § 3466.

The United States Supreme Court in its latest interpretation of the application of § 3466 to a Chapter X proceeding started with the *Emory* case:

"Thus on the face of the statute, no inconsistency arises from applying both § 3466 and § 199 to Chapter X proceedings, much less the 'plain inconsistency' required if respondent is to prevail under the test of United States v. Emory, *supra*. That in itself strongly suggests that § 3466 should apply here, and our examination of the background and legislative history of § 199 and of Chapter X generally does not reveal a contrary intent on the part of Congress.

"Before the reorganization legislation of the 1930's the principal method of reorganizing corporations that were unable to meet their debts was the equity receivership. This judge-made device was designed to preserve the debtor business as a going concern by cancelling claims against it, in return for which cancellation the claimants received debt or equity interests in a new corporation, which then acquired the assets of the old corporation in a judicial sale. See T. Finletter, The Law of Bankruptcy Reorganization 1–17 (1939). By 1926, it was established that § 3466 applied to give the United States an absolute priority for payment of debts due it from insolvent corporations in equity receivership. Price v. United States, 269 U.S. [492] at 502–503; [46 S.Ct. 181–182, 70 L. Ed. 373] and see Blair, The Priority of the United States in Equity Receiverships, 39 Harv.L.Rev. 1 (1925).

"In 1933, Congress enacted § 77 of the Bankruptcy Act, 47 Stat. 1474, providing a statutory procedure for the reorganization of railroads. Section 77, as well as later corporate reorganization statutes discussed below, was designed to follow the general format of the equity receivership. As one of the early commentators on the federal statutes has noted, '[t]he principles of the equity receivership underlie nearly every substantive provision of the [reorganization acts].' Finletter, *supra*, at 3. These statutes were not, of course, mere codifications of the law governing equity receiverships. They were designed in part to correct abuses and inefficiencies that had existed under the prior regime. Duparquet [Huot & Moneuse] Co. v. Evans, 297 U.S. 216, 218–219, [56 S.Ct. 412, 413–

414, 80 L.Ed. 591] (1936). However, the problems of the equity receivership that led to the legislative intervention did not include the Government's priority under § 3466, a relatively uncontroversial aspect of the receivership procedure.

"*Nothing in § 77 casts any doubt on the continued priority of the United States under § 3466.* Indeed the only provision in the new statute affecting the claims of the United States was § 77(e), which provided in pertinent part:

" 'If the United States of America is directly a creditor or stockholder, the Secretary of the Treasury is hereby authorized to accept or reject a plan in respect of the interests or claims of the United States.' 47 Stat. 1478.

The purpose of this provision was to overcome the effect of two prior rulings of the Attorney General that the Secretary of the Treasury lacked authority to compromise claims of indebtedness owed to the Government by the railroads, 33 Op.Atty.Gen. 423 (1923), 34 Op.Atty.Gen. 108 (1924).[8]

"8. See Senate Committee on the Judiciary, Criticisms and Suggestions Relating to H.R. 14359 and S. 5551, Amending the Bankruptcy Act 19–20, 72d Cong., 2d Sess. (Comm.Print.1933).

"In 1934, Congress enacted § 77B of the Bankruptcy Act, 48 Stat. 911, which provided a reorganization scheme for corporations generally, closely modeled on the railroad reorganization scheme of § 77; § 77B(e) (1) granted the Secretary of the Treasury power to compromise federal claims, in language almost identical with that of § 77(e). 48 Stat. 918. *There is no language in the statute, and nothing in its history, to suggest any intention to alter the established priority of the United States under § 3466.*

"In 1935, the Secretary of the Treasury called the attention of Congress to the fact that the courts were construing § 77B(e) (1) to include the United

States among the general creditors in reorganization proceedings, so that plans disapproved by the Secretary for failure to satisfy a federal claim could nevertheless be confirmed if the necessary majority of general creditors approved. S.Rep.No.953, 74th Cong., 1st Sess. (1935). The Secretary proposed an amendment, which, after some weakening in the House, see S. Rep.No.1386, 74th Cong., 1st Sess. (1935), was adopted.[9] 49 Stat. 966

"9. The Secretary had proposed that he be given a veto over plans that failed to provide for "payment" of *any* federal claim. See S.Rep.No.953, *supra.* The House imposed the "payment" requirement only upon tax and customs claims, possibly intending to leave the Government in the position of a general creditor with respect to other claims, see S.Rep.No.1386, *supra,* and this was the form in which the amendment was adopted. Section 199 preserves this apparent distinction between tax and other claims, see text at n. 4, *supra.* However the courts, relying on the strong presumption against implied exceptions to § 3466, have not treated the Government as a general creditor in its nontax claims, but rather have held that it has priority under § 3466. United States v. Anderson, 334 F.2d 111 (C.A. 5th Cir. 1964) ; In re Cherry Valley Homes, Inc., 255 F.2d 706 (C.A. 3d Cir. 1958) ; Reconstruction Finance Corp. v. Flynn, 175 F.2d 761 (C.A. 2d Cir. 1949).

"If, as appears from the present case, § 3466, if applicable, may in some instances give the Government greater protection than § 199, it would be anomalous to deny that protection to Government tax claims while granting it to nontax claims, since Congress clearly intended that tax claims should have greater protection.

(1935). In its relevant provisions, the amendment was identical with present § 199, and the 1938 revisions which culminated in the replacement of § 77B by present Chapter X did not affect it.

"Thus § 199 is derived from an enactment designed to grant the Government the power to compromise its claims against debtors, and an amendment designed to ensure priority for federal claims over the claims of general creditors. Nothing in this background lends any support to respondent's claim that the draftsmen of Chapter X meant to provide an exception

to the operation of § 3466 for reorganization proceedings under the new statute. Indeed the established practice of applying § 3466 to equity receiverships, the acknowledged predecessor of the Chapter X proceeding, combined with the failure to indicate in any way an intent to alter that practice in the new statutes, supports the conclusion that Congress affirmatively meant § 3466 to apply to statutory reorganization.[10]

"10. The leading authorities agree that § 3466 applies to Chapter X proceedings. Finletter, *supra*, at 388–393; 6A Collier on Bankruptcy 269 n. 11 (14th ed. 1969).

"*As we noted at the outset, § 3466 must apply according to its terms except where expressly superseded, or where excluded by a later enactment 'plainly inconsistent' with it. Here the statute literally applies, and no plain inconsistency with the scheme of Chapter X appears.* The terms of § 3466 are clearly not satisfied by the reorganization plan here in question, which provides payment in part to general creditors and other nonpreferred claimants[11] before satisfaction of the

"11. This case does not raise the question, never decided by this Court, whether § 3466 grants the Government priority over the prior specific liens of secured creditors. See United States v. Gilbert Associates, 345 U.S. 361, 365–366 [73 S.Ct. 701, 704–705, 97 L.Ed. 1071] (1953).

federal tax claim. Therefore the judgment upholding the plan must be reversed, and the case remanded to the Court of Appeals for further proceedings consistent with this opinion." United States v. Key, *supra* at 329–333, 90 S.Ct. at 1054. (Emphasis added.)

The interpretative instructions of the Supreme Court italicized above, as well as the dictum referring squarely to section 77 proceedings, seem clearly to require the application of § 3466 to the instant case.

The most difficult problems of statutory interpretation pertaining to this issue, however, concern specific statutory language establishing or dealing with priorities which may be argued to conflict with § 3466. There is language in some cases which says that § 3466 "does not apply in bankruptcy" cases. United States v. First National Bank & Trust of Fargo, 386 F.2d 646, 648 (8th Cir. 1968); Adams v. O'Malley, 182 F.2d 925 (8th Cir. 1950); In re Taylorcraft Aviation Corp., 168 F.2d 808, 810 (6th Cir. 1948). Such language must be limited to the facts of the issues decided in the cases. It is clear, for example, that section 64(a) of the Bankruptcy Act does apply in conventional bankruptcies and is clearly inconsistent with the absolute priority of § 3466. This, of course, might lead to the conclusion that § 3466 was not applicable to conventional bankruptcies (as stated by the courts above) except for its possible incorporation as a fifth priority under § 64(a)(5).

When the Supreme Court in Davis v. Pringle, 268 U.S. 315, 45 S.Ct. 549, 69 L.Ed. 974 (1925), held that the United States was not "a person" within the meaning of § 3466 and that hence § 3466 was not incorporated into the fifth priority accorded by § 64(a)(5), Congress promptly amended § 64(a)(5) to make explicit its intention that § 3466 should apply. *See* the Chandler Act, June 23, 1938, 52 Stat. 874, amending 64(a)(5) of the Bankruptcy Act.

■ It appears clear, however, that § 64(a) does not apply to the chapters of the National Bankruptcy Act which do not deal with conventional bankruptcies, absent specific reference thereto. *See* 11 U.S.C. § 502 (1970), which generally applies the provisions of Chapters I to VII in Chapter X proceedings and then specifically excludes § 64(a) (11 U.S.C. § 104 (1970)) and 11 U.S.C. § 1059 (1970) which specifically applies § 64(a) to Chapter XIII proceedings. We conclude that Congress is thoroughly familiar with § 64(a) (as well as § 3466) and if it had intended it to apply to Chapter VIII dealing with railroad reorganizations, it would have said so.

■ Another somewhat difficult argument may be made concerning the follow-

ing language included in Chapter VIII, 11 U.S.C. § 205(e) (1970):

> "*Provided further,* That if, in any reorganization proceeding under this section, the United States is a creditor on claims for taxes or customs duties (whether or not the United States has any other interest in, or claim against, the debtor, as creditor or stockholder), no plan which does not provide for the payment thereof shall be confirmed by the judge except upon the acceptance, certified to the court, of a lesser amount by the President of the United States or the officer or agency designated by him pursuant to the provisions of the preceding paragraph hereof:"

This provision, however, does no more than provide a very stringent method for compromise of federal tax or customs claims and as we see the matter, cannot appropriately be viewed as "plainly inconsistent" with the basic priority established by § 3466. We note legislative history language which can be argued to the contrary of this conclusion. Senate Rept. No. 1985, 74th Cong. 2d Sess. (1936); H.R.Rep.No. 2926, 74th Cong. 2d Sess. 6 (1936). In this regard, however, we find the actual language employed in the statute utterly inadequate to express any exclusion of § 3466. Further, in United States v. Key, 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1969), dealing with a similar argument concerning similar language incorporated in Chapter X, § 199, the Supreme Court said:

> "In approaching a claim of an implied exception to § 3466, we start with the principle, noted above, that the statute must be given a liberal construction consonant with the public policy underlying it. Applying that principle to an earlier claim that a statutory scheme implicitly excluded § 3466, this Court held that '[o]nly the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466.' United States v.

Emory, 314 U.S. 423, 433 [62 S.Ct. 317, 86 L.Ed. 315] (1941).

> "Here the Court of Appeals discerned an intent not to apply § 3466 to Chapter X proceedings from § 199 of the Bankruptcy Act, which forbids the approval of any reorganization plan which does not provide for the 'payment' of taxes or customs due to the United States, unless the Secretary of the Treasury accepts 'a lesser amount.'" United States v. Key, *supra* at 324–325, 90 S.Ct. at 1051. (Footnote omitted.)

After reciting other claimed bases for excluding application of § 3466 to Chapter X proceedings, the Court concluded:

> "In our view these provisions are not logically inconsistent with the terms of § 3466, nor would they be rendered redundant if the older statute applied, nor does their language or legislative history reveal a purpose incongruous with its application." United States v. Key, *supra,* 397 U.S., at 326, 90 S.Ct. at 1052.

Again as to this issue, we feel that United States v. Key, *supra,* controls decision of our present case. If there be, as appellees argue, overriding policy and equitable considerations which cry for a different result, those contentions must be made before Congress for specific statutory amendments. · *See* Plumb, The Federal Priority in Insolvency: Proposals for Reform, 70 Mich.L.Rev. 1 (Nov. 1971) page 3.

■ As to appellee Koppers Company, Inc., and the various city and county claimants for taxes, we note that these claims are founded primarily upon liens authorized by state statutes. It is, however, clear to us that federal and not state law controls both in determining priority and in determining whether the lien relied upon is "choate" or "inchoate." None of the liens relied upon in this record were the subject of proceedings designed to divest the debtor of either title or possession of its property prior to bankruptcy. *See* United States v. Gilbert Associates, Inc., 345 U.S. 361,

73 S.Ct. 701, 97 L.Ed. 1071 (1953); State of Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946).

In *Gilbert* the Supreme Court said:

"In claims of this type, 'specificity' requires that the lien be attached to certain property by reducing it to possession, on the theory that the United States has no claim against property no longer in the possession of the debtor. Thelusson v. Smith, 2 Wheat. 396 [4 L.Ed. 271]. Until such possession, it remains a general lien. There is no ground for the contention here that the Town had perfected its lien by reducing the property to possession. The record reveals no such action. The mere attachment of the Town's lien before the recording of the federal lien does not, contrary to the holding of the Supreme Court of New Hampshire, give the Town priority over the United States. The taxpayer had not been divested by the Town of either title or possession. The Town, therefore, had only a general unperfected lien. United States v. Waddill [Holland & Flinn] Co., [323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294] *supra*; Illinois [ex rel. Gordon] v. Campbell, 329 U.S. 362, 370, [67 S.Ct. 340, 91 L.Ed. 348]. Where the lien of the Town and that of the Federal Government are both general, and the taxpayer is insolvent, § 3466 clearly awards priority to the United States. United States v. Texas, 314 U.S. 480, 488 [62 S.Ct. 350, 86 L.Ed. 356]." United States v. Gilbert, *supra*, 345 U.S., at 366, 73 S.Ct. at 704.

The liens of appellees herein are not "specific and perfected liens." United States v. Waddill, Holland & Flinn, Inc., 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1945). They are general liens under federal law and § 3466 "clearly awards priority to the United States." United States v. Gilbert, *supra*, 345 U.S., at 366, 73 S.Ct. at 705. *See also* Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946); United States v. Texas, 314 U.S. 480, 62 S.Ct. 350, 86 L.Ed. 356 (1941).

Since we believe that § 3466 and the recent interpretation of it in United States v. Key, *supra*, control this case, we have no occasion to analyze the government's other contentions to the effect that its claims are entitled to priority because there was no diversion of income such as to occasion application of the six months rule and that its claims were both secured claims and first in time.

We also note but reject appellees' assertion that we should find a controlling distinction between this case and the *Key* case in the fact that these debts to the United States are secured obligations arising from Reconstruction Finance Corporation loans, whereas the debts in *Key* were for federal taxes.

Federal claims which are secured by mortgage or lien are nonetheless "debts" within the meaning of § 3466 and hence entitled to priority thereunder. Small Business Administration v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960); W. T. Jones & Co. v. Foodco Realty, Inc., 318 F.2d 881 (4th Cir. 1963).

Further, although the application of § 3466 was originally excluded by the statute creating the Reconstruction Finance Corporation (15 U.S.C. § 603 (1970)), the R.F.C. was abolished in 1957 and its loans were transferred to the Secretary of the Treasury. The exclusion clause itself was repealed in 1966 by recodification of Title 5. Pub.L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 648, 654, 655.

The judgment of the District Court is vacated and this case is remanded for further proceedings in accordance with this opinion.

On Petition for Rehearing

Before WEICK, EDWARDS and PECK, Circuit Judges.

Petitions for rehearing and a suggestion for rehearing in banc having been filed by defendants-appellees in the above-styled case, and no judge of this court having moved for rehearing in banc

and the petition for rehearing having been assigned to the panel which heard the case, with Judge Paul C. Weick designated to serve in place of Judge Henry L. Brooks, deceased, said petitions are hereby denied, for the reasons set forth in the opinion of the court.

WEICK, Circuit Judge (dissenting).

This case is important to over $1,200,-000 of creditors in railroad reorganization proceedings under Section 77 of the Bankruptcy Act, creditors whose priority claims were subordinated to the claim of the United States by the Court's opinion which reversed a judgment of the District Court[1] to the contrary. The case involves construction of the priority provisions of the Act, of the Reconstruction Finance Corporation Act as amended,[2] the applicability of R.S. § 3466, and the effect of the abolishment of R.F.C. and the repeal of statutes creating it.

Without question, the priority claims of the creditors were superior to the loan of R.F.C. which was secured by pledge of an issue of First Mortgage 4% Bonds. The United States claimed, however, and the Court held, that because of the abolishment of R.F.C. and repeal of the statutes many years after the loan was made, the Government need not look to the lien of its mortgage bonds, but could claim priority under R.S. § 3466, which the Reconstruction Finance Corporation Act, as amended, (and prior to its repeal) provided was inapplicable.

The Court's opinion is based entirely on dicta in United States v. Key, 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970); but *Key* involved a different type of proceeding, namely, a corporate reorganization under Chapter X of the Bankruptcy Act, rather than a railroad reorganization proceeding under Section 77, such as was involved in the present case. Counsel even question the validity of the dicta, pointing out that the court on page 330, 90 S.Ct. 1049, 25 L.Ed.2d 340 quoted Section 77(e), as it existed prior to the Act's amendment in 1935,

when the statute was rewritten entirely and drastically changed.

There is nothing in the Court's opinion to indicate that it considered amended section 77.

Furthermore, *Key* involved a tax claim of the United States. Our case, unlike *Key*, involved a loan made by R.F.C. to the railroad, which loan was secured by a pledge of $6,216,000 of First Mortgage 4% Bonds. At the time the railroad went into reorganization it owed the Government on the loan $4,571,000 in principal, and $461,731.13 in interest.

The statute creating R.F.C. granted it power to sue and to be sued, and expressly provided:

"Debts due the Corporation, whether heretofore or hereafter arising, shall not be entitled to priority available to the United States pursuant to section 191 of Title 31 (R.S. 3466) . . . ."

In Reconstruction Finance Corp. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595 (1941), the Court refused to treat RFC as the United States, holding that costs could be assessed against it the same as against any other litigant.

R.F.C., however, was abolished in 1957 pursuant to provisions of the 1949 Reorganization Act (Ch. 226, p. 203) and Reorganization Plan No. 1 of 1957 (22 F.R. 4633, 71 Stat. 647), and its assets were transferred to the Secretary of the Treasury. See also 15 U.S.C.A. §§ 601 and 603 notes.

It was not until nine years later that Congress enacted the Omnibus Reorganization Act repealing hundreds of obsolete statutes, only part of which related to the RFC. We are asked to infer therefrom that Congress intended to restore priority of the United States, thereby displacing the lien of existing mortgage indebtedness of RFC, to the prejudice of priority creditors. It is not believed that Congress intended to do any such thing.

In my opinion, to grant the United States priority would conflict with two

---

1. 316 F.Supp. 1103 (M.D.Tenn.1970).

2. 15 U.S.C. § 603.

decisions of the Supreme Court which held that claims of the Government for money loaned to railroads during federal control, were not entitled to priority. United States v. Guaranty Trust Co., 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556 (1930), and Mellon v. Michigan Trust Co., 271 U.S. 236, 46 S.Ct. 511, 70 L.Ed. 924 (1926).

The purpose of the RFC loans to railroads was to keep the railroads in operation, to rehabilitate them, and to preserve the existing transportation system. It was a public purpose. This was also the purpose of the Railroad Reorganization Act (Section 77). The statute creating RFC provided specific means to insure repayment of loans other than the priority provision of § 3466. These means were strictly followed in the present case by a pledge of First Mortgage 4% Bonds to secure the loan.

While there was no express provision in the federal control statutes excluding indebtedness to the Government from the operation of § 3466, the Court held in United States v. Guaranty Trust Co., *supra*, 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556 that Congress intended such exclusion. The Court said:

"Moreover, Congress evidenced unmistakably its purpose to rely, for obtaining payment of the Government's advances, upon means other than the priority provided for by § 3466. Under all of the sections, the giving of adequate security was either required or left to the discretion of the President. Under § 210 no advance could be made, unless the Interstate Commerce Commission was satisfied that the earning power of the carrier and the security given furnished reasonable assurance that the loan would be repaid and all obligations in connection therewith would be performed. The interest rate required is much greater than that which ordinarily accompanies even a business loan carrying such assurance of repayment as would have resulted from an application of the priority rule. Thus, both the general purposes of Title II and its specific provisions make it clear that Congress intended to exclude the indebtedness so arising from the scope of § 3466 of the Revised Statutes, just as under the Federal Control Act it had excluded therefrom claims incident to current operation of the railroads. Mellon v. Michigan Trust Co., 271 U.S. 236, 240 [46 S.Ct. 511, 70 L.Ed.2d 924]" (Id. at 485-486, 50 S.Ct. at 214).

It is clear that railroads cannot operate without credit. The credit is necessary to obtain labor, materials and interline accommodations with other railroads; without such credit operations would cease.

It further appears from the record that RFC, as well as the Secretary of the Treasury, permitted the railroad to operate when they both knew that in so doing the railroad was incurring debts and losing substantial sums of money. By the continuous operation the mortgage security of the Government was preserved, and the trustee in the reorganization proceeding was enabled to sell the railroad as a going concern and without interruption of service to the public. The Government here was entitled to treatment no different than that accorded to any other secured creditor.

Equitable principles which are applied in creating priority liens of creditors under Section 205 for credit furnished within a period of six months prior to the reorganization proceeding, should be adhered to. Southern Ry. Co. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458 (1900); Burnham v. Bowen, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596 (1884); Miltenberger v. Logansport, C & S W Ry., Co., 106 U.S. 286, 311, 1 S.Ct. 140, 27 L.Ed. 117 (1881); Southern Ry. Co. v. Flournoy, 301 F.2d 847 (4th Cir. 1962).

Reliance upon cases such as United States v. Emory, 314 U.S. 423, 62 S.Ct. 317, 86 L.Ed. 315 (1941) and Small Business Adm'n v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960), involving commercial loans to private individuals, is misplaced. There was no

statute involved in these cases which excluded the operation of § 3466, or facts from which an intent on the part of Congress to exclude operation of § 3466 could possibly be inferred.

Nor was there involved in these cases a comprehensive scheme of Congress, as is evidenced by the Railroad Reorganization Act, to keep railroads in operation and to provide means for their rehabilitation which could be frustrated if the railroad's ability to obtain credit from private sources is impaired.

Substantial questions are presented in the appeal, and I respect the views of my colleagues. I would grant the rehearing and determine priorities excluding the operation of § 3466.